## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **QSRSOFT, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  06 C 2734** |
| | ) | |
| **RESTAURANT TECHNOLOGY, INC.,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff QSRSoft, Inc.'s ("QSRSoft")
motion for entry of a preliminary injunction against Defendant Restaurant
Technology, Inc. ("RTI").  For the reasons stated below, we grant QSRSoft's motion
for a preliminary injunction.

## BACKGROUND

QSRSoft contends that every McDonald's Restaurant has a McDonald's
Corporation computer system, an in store processor ("ISP"), that stores data about
the restaurant's sales performance and status.  McDonald's Corporation allegedly
provides restaurant operators with limited reports, called R2D2, but in no relation to

1

Star Wars, generated from the ISP data. Additionally, QSRSoft alleges that

McDonald's Corporation has approved QSRSoft and RTI as back-office vendors,

meaning that each has access to the data stored in the ISP. Both QSRSoft and RTI

provide software tools to McDonald's Restaurant franchise owners and operators

("franchisees"). QSRSoft contends that both companies' software tools use data

extracted from the ISP.

QSRSoft alleges that it developed the DotComm System, an internet-based

computer system that assists franchisees in analyzing information collected from the

restaurants. QSRSoft contends that the DotComm System differs from other

competitors' systems in that it more quickly collects and processes information from

restaurants, provides automatic information transfer backup, and provides underlying

detail or reports. QSRSoft alleges that if a franchise wants to use the DotComm

System, the franchisee must first obtain a licensing agreement, which includes a

provision that only key management personnel are permitted to access the DotComm

System due to its proprietary nature. According to QSRSoft, a franchisee is provided

with the opportunity to evaluate the DotComm System for thirty days under the

terms of a software evaluation licensing agreement. QSRSoft contends that once the

franchisee agrees to the licensing agreement and identifies a list of the key personnel

that will have access to the DotComm System, QSRSoft sends the franchisee an

access code and unique password. QSRSoft alleges that the DotComm System

automatically instructs the user to change the password during the first time the

franchisee accesses the system. According to QSRSoft, the franchisee informs

2

QSRSoft of the updated password.

QSRSoft claims that in January 2006, RTI, who provides predominantly accounting software to fast food restaurants, contacted F.A.F., Inc. d/b/a McDonald's Restaurant ("FAF"), which operates nine McDonald's restaurants in Fargo, North Dakota, to obtain information from QSRSoft about the DotComm System. QSRSoft contends that in February 2006, Gregg Matejka ("Matejka"), FAF's director of operations, contacted QSRSoft about evaluating the DotComm System in one of FAF's McDonald's restaurants. QSRSoft claims that it subsequently sent a licensing agreement ("Agreement") to FAF and requested that the Agreement be executed and returned to QSRSoft. QSRSoft further alleges that on February 8, 2006, QSRSoft sent an access code and password to FAF in anticipation of receiving the executed Agreement from FAF. Although FAF did not return the Agreement, QSRSoft contends that FAF understood that FAF was accepting the terms of the Agreement and would use the DotComm System subject to such terms. QSRSoft claims that on February 8, 2006, FAF accessed the DotComm System using the newly provided access code and password, a process that required FAF to change the initial password. According to QSRSoft, on or about February 9, 2006, FAF provided RTI with the access code and the recently changed password ("FAF password").

QSRSoft alleges that RTI used the FAF password from February 2006 until April 30, 2006 in order to gain access to the DotComm System, view, download, save, print, and copy each web page on the DotComm System, as well as to download the QSRSoft Data Engine, the backbone of the DotComm System's ability

3

to extract restaurant information. QSRSoft claims that RTI was able to use the information it received from accessing the DotComm System to develop Reports+, a similar RTI product for McDonald's franchises.

On August 8, 2006, QSRSoft filed an amended complaint that includes claims alleging copyright infringement under the Copyright Act of 1976, 17 U.S.C. 101 *et seq.* ("Copyright Act") brought against RTI (Count I), James H. Clutter ("Clutter") (Count II), and J. Neal Starkey ("Starkey") (Count III), claims alleging violations of the Illinois Trade Secret Act, 765 ILCS 1065/1 *et seq.*, ("ITSA") brought against RTI, Clutter, and Starkey (Count IV), conversion claims brought against RTI, Clutter, and Starkey (Count V), tortious interference with prospective business advantage claims brought against RTI, Clutter, and Starkey (Count VI), and tortious interference with contract claims brought against RTI, Clutter, and Starkey (Count VII).

On August 23, 2006, RTI filed a partial motion to dismiss Counts IV, V, and VII. On October 18, 2006 we denied RTI's partial motion to dismiss to the extent that it related to Counts IV and VII, and granted the motion to dismiss to the extent that it related to Count V. QSRSoft now seeks a preliminary injunction.

## LEGAL STANDARD

A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dept. of Fin. &Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)(stating that "[a]s the Supreme Court

4

has observed, '[a] preliminary injunction is an extraordinary and drastic remedy'")(quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). When determining whether to use such a remedy, "the district [court] has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)(quoting *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986)).

In order to obtain a preliminary injunction, a plaintiff must show that: "(1) [the plaintiff] ha[s] a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) [the plaintiff] will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *Goodman*, 430 F.3d at 437. A likelihood of success means that the party has a "better than negligible chance" of succeeding on the merits. *Washington v. Ind. High Sch. Ath. Ass'n*, 181 F.3d 840, 845 (7th Cir. 1999). Once the above four conditions are satisfied, the court evaluates the likelihood of success on a sliding scale. *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). The factors in the sliding scale analysis include the irreparable harm the party would endure without the preliminary injunction, any irreparable harm the opposing party will suffer as a result of the preliminary injunction, and any harm or benefit to the public if the injunction is granted or denied. *AM General Corp.*, 311 F.3d at 803-04; *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The sliding scale

works in such a way that a lesser likelihood of success may support a preliminary injunction if the balance of harms favors the party seeking the remedy. *Ty*, 237 F.3d at 895; *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). Likewise, a stronger likelihood of success permits granting a preliminary injunction even if the balance of harms is not necessarily in the seeking party's favor. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 298 (7th Cir. 2001).

## DISCUSSION

### I.  Reasonable Likelihood of Success on the Merits

#### A.  Copyright Claims

Section 502(a) of the Copyright Act authorizes the court to issue a preliminary injunction "on such terms as [the court] may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  Irreparable injury may be presumed upon the showing of a *prima facie* case of copyright infringement. *Atari Inc. v. North Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 620 (7th Cir. 1982). To prevail on a copyright infringement claim, QSRSoft must prove that (1) QSRSoft owned a valid copyright, and (2) RTI copied original elements, or infringement, of the work. *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).

#### 1.  Copyright Validity

QSRSoft has registered copyrights in the Data Engine, Source Code, and

6

QSRSoft Website. (P. Ex. 1). The Copyright Act provides that:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Since QSRSoft has provided Certificates of Registration for the Data Engine, Source Code, and QSRSoft Website ("Website") and each of the copyright registrations is within the past five years, the registrations are entitled by statute to a *prima facie* presumption of validity. *Id*. This presumption of validity and ownership is rebuttable. *Id*.

Although QSRSoft's registration certificates constitute *prima facie* evidence of validity, not every element of the copyrighted work is protected. Since the court must inquire as to what aspects of the work have been afforded copyright protection, it is not enough for QSRSoft to merely present the registration certificates. QSRSoft has failed to present evidence of the Data Engine and Source Code during the preliminary hearing or in its brief, but has introduced an example of the Website as Exhibit 1. Therefore, because QSRSoft has not presented sufficient evidence to support the likelihood of success on its copyright claims pertaining to the Data Engine and Source Code, we will only consider the copyright claim pertaining to the Website.

RTI argues that QSRSoft has failed "to show that it has an *original* work and not a mere compilation of unprotectable data . . . [and has] failed to satisfy its

burden." (Prelim. Inj. Resp. 10)(emphasis in original). However, because proof of registration within five year after first publication of the work constitutes a *prima facie* presumption of validity, the burden does not fall upon QSRSoft to prove validity, but rather on RTI to rebut the presumption of copyright validity. 17 U.S.C. § 410(c). RTI contends that QSRSoft's copyrighted works are invalid because the Supreme Court in *Feist* has stated:

> Since facts do not owe their origin to an act of authorship, they are not original and, thus, are not copyrightable . . . *copyright protection extends only to those components of the work that are original to the author, not to the facts themselves.*

(Prelim. Inj. Resp. 10)(citing "*Feist*, 499 U.S. at 340" [Syllabus]). The Syllabus of *Feist*, however, does not constitute the opinion of the Supreme Court, but instead a summary of the case for the convenience of the researcher. *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337 (1905). Additionally, *Feist* does not stand for the proposition that a composition of facts are beyond copyright protection or that a compilation of facts requires more than a quantum of originality required to obtain a copyright in the work. *Feist*, 499 U.S. at 361. The *Feist* Court stated:

> Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted. A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may copyright extend to the facts themselves.

*Id*. at 351-52. Thus, while QSRSoft cannot copyright the ISP data, QSRSoft may copyright the manner in which it displays the data. Since the Data Engine and Source Code are not before this court, we are unable to determine the validity of

those works. However, as stated above, a hardcopy of the QSRSoft Website was presented at the preliminary injunction hearing. (P Ex. 7). For the Website, QSRSoft does not contend to be copyrighting the ISP data, but does claim to be copyrighting the way in which it presents the data in the graphical displays. Accordingly, we find that there is sufficient evidence that shows that QSRSoft has met its burden to show a *prima facie* presumption of validity and RTI has not presented sufficient evidence to rebut such.

### 2. Copying of Original Expressions

The evidence presented during the preliminary injunction hearing indicates that QSRSoft is likely to prove the direct infringement of its works by RTI. The Copyright Act defines direct infringement as "[a]nyone who violates any of the exclusive rights of the copyright owner." 17 U.S.C. 501(a). The internet access logs demonstrate that RTI accessed the password protected copyrighted Website. The access logs also establish that RTI employees viewed, printed, and downloaded the information while viewing the Website. By downloading and printing the Website, RTI violated QSRSoft's exclusive right to reproduce the protected works. *See Marobie-Fl., Inc. v. National Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1173-74 (N.D. Ill. 1997)(finding that downloading clip art constituted a violation of the plaintiff's right to reproduce its copyrighted work); *Sega Enterprises Ltd. v. Maphia*, 948 F. Supp. 923, 931-32 (N.D. Cal. 1996)(finding that the new copies of a program were created upon uploading and downloading); *Playboy Enterprises, Inc.*

*v. Frena*, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993)(finding that uploading files containing copyrighted photographs constituted reproduction).

RTI argues that in order to prove that RTI infringed QSRSoft's copyrighted work the court must perform a "side-by-side" comparison of QSRSoft's product and RTI's product. RTI cites *Bridgmon v. Array Systems Corp.*, 325 F.3d 572 (5th Cir. 2003), to support the need for a "side-by-side" comparison. In *Bridgmon*, the Fifth Circuit affirmed the granting of summary judgment because the plaintiff failed to produce evidence that would allow the court to do a "side-by-side" comparison. However, we decline to adopt *Bridgmon*. First, the *Bridgmon* court stated that "the law of [the Fifth] [C]ircuit prohibits finding copyright infringement without a side-by-side comparison of the two works," *id*. at 577, this court is not bound by the rulings of the Fifth Circuit. Second, the law of the Seventh Circuit, which is binding authority, does not require a "side-by-side" comparison of the products, but rather requires a substantial similarity between the plaintiff's copyrighted work and the defendant's work if there is no evidence of direct infringement. *Atari Inc.*, 672 F.2d at 614; *see Sassafras Enter. v. Roshco, Inc.*, 889 F.Supp 343 (N.D. Ill. 1995)(noting that a side-by-side comparison is not required in the Seventh Circuit). Third, since there is a substantial likelihood of direct infringement, there is no need for this court to perform a substantial similarity test in this case. Fourth, *Bridgmon* occurred at the summary judgment stage of the proceeding, after completion of discovery, rather than during the preliminary injunction stage where discovery had not been completed and where the plaintiff would have needed only to show a likelihood of success on

10

the merits.  Finally, because we are focused solely on the Website, we are able to

perform the "ordinary observer" test applied in the Seventh Circuit.  *Atari Inc.*, 672

F.2d at 614.  Therefore, QSRSoft has a strong likelihood of showing that RTI copied

original elements of the copyrighted Website.


B.  Trade Secret Misappropriation

Under the ITSA, the court may issue an injunction if there is "actual or

threatened misappropriation of a trade secret."  765 ILCS 1065/3(a).  QSRSoft

claims that RTI misappropriated "at least two of" its trade secrets:  the Specific ISP

Data and the 100+ web-page displays ("Screen Shots").  (Mot. 12).  For QSRSoft to

show a "better than negligible chance" on succeeding on its ITSA trade secret

misappropriation claim, QSRSoft must show that (1) there is a trade secret; (2) the

trade secret was misappropriated by RTI; and (3) RTI used the trade secret for

business purposes.  *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962

F.2d 1263, 1265-66 (7th Cir. 1992)(citing 765 ILCS 1065/2).


1.  Existence of Trade Secrets

The ITSA defines a trade secret as:

[I]nformation, including but not limited to, technical or non-technical data, a
formula, pattern, compilation, program, device, method, technique, drawing,
process, financial data, or list of actual or potential customers or suppliers,
that:

> (1) is sufficiently secret to derive economic value, actual or potential,
> from not being generally known to other persons who can obtain

>        economic value from its disclosure or use; and
>        (2) is the subject of efforts that are reasonable under the circumstances
>        to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). The ITSA therefore "precludes trade secret protection for
information generally known or understood within an industry even if not to the
public at large," *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct.
1998), and "requires a plaintiff to take 'affirmative measures' to prevent others from
using [the] information." *Jackson v. Hammer*, 653 N.E.2d 809, 816 (Ill. App. Ct.
1995); *see Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th
Cir. 2003)(noting that the ITSA "prevents a plaintiff who takes no affirmative
measures to prevent others from using its proprietary information from obtaining
trade secret protection"). In determining whether a trade secret exists, Illinois courts
generally look to: (1) the extent that the information is known outside of the
business; (2) the extent that the information is known to employees and others within
the business; (3) the measures taken to protect the information from outsiders; (4) the
value of the information to competitors; (5) the amount of time, money, and effort to
develop the information; and (6) the ease that the information could be acquired by
others. *Learning Curve Toys*, 342 F.3d at 722. We disagree with RTI's contention
that QSRSoft does not have any trade secret rights in the Specific ISP Data and
Screen Shots.

    The evidence shows that QSRSoft is likely to succeed in establishing the
existence of valid trade secrets. First, although the ISP data is not stored on QSRSoft

computers and the ISP data is owned by McDonald's franchisees, how QSRSoft compiles and manipulates the Specific ISP Data for use in the DotComm System is not known to competitors in the industry. Second, QSRSoft has taken reasonable measures to protect its trade secrets from the general public and competitors through the use of licensing agreements, a password protected website, and generally keeping its trade secrets out of the public display at conventions. *See Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995)(finding that trade secret had not been waived when reasonable efforts were taken to protect secrecy of trade secrets from competitors). Third, QSRSoft has presented evidence that show it invested "over two and a half years, more than $2,000,000, and employed three full-time software developers and system architects" to develop the DotComm System. (Mot. 13). Finally, due to the amount of data contained in the ISP, approximately 315 tables consisting of approximately one million pieces of information, and the fact that the Specific ISP Data represents approximately one percent of the data in the ISP, competitors would have to spend a large amount of time and effort, just as QSRSoft has done, in order to ascertain the precise data needed to determine the Specific ISP Data.

RTI contends that QSRSoft does not have valid trade secrets in the ISP Data or Screen Shots, noting that QSRSoft "spends only two of fifteen pages in its Motion discussing its alleged trade secret claim . . . ." (Prelim. Inj. Resp. 10). RTI argues that QSRSoft cannot show the validity of the QSRSoft trade secrets because QSRSoft never introduced either the Specific ISP Data or Screen Shots into

13

evidence.  RTI further states that QSRSoft "failed to put into evidence exactly what information [QSRSoft] is referring to when it refers to its Specific ISP Data and DotComm Screen Shots as trade secrets."  (Prelim. Inj. Resp. 11).  In support of its argument, RTI contends that the Seventh Circuit in *Composite Marine Propellers, Inc.*, stated that "*[i]t is not enough to point to broad areas of technology and assert that something there must have been a secret and misappropriated*" and that "*[t]he plaintiff must show concrete secrets.*"  (Prelim. Inj. Resp. 11)(emphasis in brief)(quoting 962 F.2d at 1265).  In *Composite Marine Propellers*, however, the judge submitted the trade secret issues to the jury, rather than rule at the preliminary injunction stage.  *Id*. at 1266.  Additionally, RTI's brief and exhibits support the notion that QSRSoft did in fact show concrete trade secrets.  First, RTI notes that "the DotComm product . . . manipulates data that belongs to third[-]parties." (Prelim. Inj. Resp. 2).  This "manipulated data" is the Specific ISP Data trade secret referred to by QSRSoft.  *See, e.g., ISC-Bunker Ramo Corp. v. Altech*, *Inc.*, 765 F.Supp. 1310 (N.D. Ill. 1990)(finding technical manual compilations of information and procedures that were useful to financial institutions to be trade secrets under the ITSA).  Second, the declaration of Barbra Morrison, (D. Ex. B), notes that she observed QSRSoft's "demonstration of its DotComm System on the big screen television" at the McDonald's Convention in May 2006.  (D. Ex. B at 3).  One cannot find a better way of pointing out concrete examples of the Screen Shots than on a big screen television.  If at the trial stage QSRSoft is "vague about the nature of [its trade] secrets," then RTI's argument would be valid under Seventh Circuit

precedent. (Prelim. Inj. Resp. 11)(quoting *Composite Marine Propellers, Inc.*, 962 F.2d at 1266). However, at this stage of the proceedings, QSRSoft must only show that it has a better than negligible chance" of succeeding on the merits of its trade secret misappropriation claim, which includes showing the existence of trade secrets. *Washington*, 181 F.3d at 845.

RTI alternatively argues that QSRSoft did not reasonably maintain the secrecy of QSRSoft's trade secrets and QSRSoft thereby waived the trade secrets. RTI contends that in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984), "the United States Supreme Court has stated expressly that trade secrets are *extinguished*" when provided to a third-party that is not obligated to protect the confidentiality of the trade secrets." (Prelim. Inj. Resp. 11)(emphasis in original). RTI contends that the Supreme Court has stated:

> Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. Information that is public knowledge or that is generally known in an industry cannot be a trade secret. *If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.*

(Prelim. Inj. Resp. 11)(citing *Ruckelshaus*, 467 U.S. at 1002)(emphasis in brief). However, in *Ruckelshaus*, the Supreme Court was faced with the question of whether the Takings Clause of the Fifth Amendment applied to the Environmental Protection Agency's ("EPA") public disclosure of a trade secret, an intangible property, in the same way it would to tangible property. 467 U.S. at 1001-02. The particular phrase

15

cited by RTI was used by the Supreme Court to compare trade secrets to tangible property in finding that the plaintiff, Monsanto, had a property right that is protected by the Takings Clause since trade secrets have many of the characteristics of tangible property. *Id.* at 1001-04. Thus, the statement referred to by RTI is not a "clear" statement that any disclosure to a third-party waives a trade secret, but rather is a general statement of the law. (Prelim. Inj. Resp. 11).

RTI similarly cites *Skoog v. McCray Refrigerator Co.*, 211 F.2d 254, 257 (7th Cir. 1954), stating that "[t]he Seventh Circuit has similarly found that the disclosure of a trade secret to those under no obligation to protect its confidentiality destroys the trade secret." (Prelim. Inj. Resp. 11). However, *Skoog* is distinguishable from the instant action. In *Skoog*, the court found that the defendant could not misappropriate the trade secret at issue, a refrigerated cabinet, because the trade secret was no longer hidden from the public. 211 F.2d at 257-58. Specifically, the trade secret was extinguished because the plaintiff's refrigerated cabinet had been in unrestricted use in the plaintiff's grocery store, visible to anyone that entered the store, and the defendant had expressly stated that it did not accept the plaintiff's non-disclosure agreement. *Id.* In the instant action, the evidence establishes that QSRSoft's trade secrets were sufficiently guarded from the public. The efforts taken by QSRSoft to hide its trade secret from competitors such as RTI include: guarding the DotComm System with licensing agreements and a password protected website; not showing the Specific ISP Data or Data Engine to potential customers and competitors at conventions; typically only showing prospective customers and competitors less than

16

five percent of the DotComm System at conventions; typically only showing prospective customers and competitors less than five percent of the Screen Shots at conventions; not showing the DotComm web interface during demonstrations; and not allowing customers and competitors to view the DotComm source code. These efforts are more than reasonable to establish a better than negligible chance that QSRSoft will be able to show that it did not waive its trade secrets. *See, e.g., Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 320 (N.D. Ill. 1995)(holding that the plaintiff's trade secret misappropriation claim failed "because [plaintiff] took virtually no steps to protect the confidentiality" of the trade secret)(noting that none of the documents relating to the trade secret were marked as confidential (as was the plaintiff's policy with trade secrets), there was not a confidentiality agreement with the defendant, the plaintiff disclosed "either dummies or specifications" for the trade secret at issue to suppliers and competitors, and the plaintiff's president acknowledged that the competitor would be able to use the disclosed information for its own benefit); *Stampede Tool Warehouse*, 651 N.E.2d at 216 (finding that trade secret had not been waived when reasonable efforts were taken to protect secrecy of trade secrets from competitors); *cf. Skoog*, 211 F.2d at 257 (stating that it is "well established that there can be no confidential disclosure where there has been a prior disclosure to the *public without reservation*")(emphasis added).

RTI also argues that because an authorized user accessed the DotComm System and since QSRSoft did not immediately discontinue access to the DotComm

System for that user, that QSRSoft has placed its trade secrets into the public

domain. However, the evidence supports the finding that the only reported breach of

QSRSoft's efforts to keep its trade secrets hidden was performed and traced back to

RTI employees, Clutter and Starkey, who viewed, downloaded, and printed

information while on the password protected website. *See* (P. Ex. 7, 8, 9, 10,

11)(showing internet access logs of alleged unauthorized users). Additionally, the

fact that RTI understood that the DotComm System could only be accessed with the

correct login information supports the claim that RTI was aware that QSRSoft had

taken measures to protect its trade secrets. (D. Ex. D)(showing email from Matejka

to Sten with DotComm access information). RTI's surreptitious access to the

password protected website does not negate the fact that QSRSoft took reasonable

efforts to protect its trade secrets. *Learning Curve Toys*, 342 F.3d at 725. Therefore,

based on the evidence, we find that there is a strong likelihood that QSRSoft's

claimed trade secrets are protected by the ITSA.

### 2.  Trade Secret Misappropriation & Use of the Trade Secrets

The evidence also shows that QSRSoft has a strong likelihood of showing that

RTI misappropriated QSRSoft's trade secrets. The ITSA defines misappropriation

as:

> (1) acquisition of a trade secret of a person by another person who knows or
> has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of a person without express or implied
> consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or
(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

> (I) derived from or through a person who utilized improper means to acquire it;
> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2(b).

The internet access logs establish that RTI employees repeatedly accessed the DotComm System through the password protected website, viewed and printed the Screen Shots, and downloaded and saved the DotComm data archive containing historical FAF data that establishes the Specific ISP Data. Due to the amount of time and money expend by QSRSoft software developers and system architects to compile, manipulate, and solve the data contained in the ISP, coupled with the fact that there was no other product on the market that analyzed the data in such a way, at the very least, the information downloaded and saved by RTI served as a guide to RTI. Such a guide would have made it easier for RTI to develop Reports+, a direct competitor to the DotComm System. Even if RTI did not directly copy QSRSoft's trade secrets, using the trade secrets as a guide likely rises to the level of misappropriation. *See Affiliated Hosp. Prods., Inc. v. Baldwin*, 373 N.E.2d 1000, 1006 (Ill. App. Ct. 1978)(stating that "even accepting their denial of any literal copying of [the] drawings, these drawings aided defendants in the design [of the

19

infringing machinery], if only to demonstrate what pitfalls to avoid").

Additionally, RTI's competing product, Reports+, bears a strong resemblance to QSRSoft's DotComm System.  First, both products use identical information, the Specific ISP Data contained within the ISP, to create reports for McDonald's franchisees.  Second, the look and feel of the graphical summaries on the DotComm System's main page, (P Ex. 6), is nearly identical to RTI's brochure advertising Reports+. (P Ex. 7).  Third, the information listed on the DotComm System's main page is strikingly similar to RTI's brochure advertising Reports+.  Fourth, Matejka, who has used both products, testified that Reports+ "looked very similar to the QSRSoft Product."  (R. 47).  These similarities exist despite the fact that RTI claims that "[t]he RTI Development Team did not download, use, or otherwise refer to [the] 'QSRSoft Data Engine,' including the source code associated with that engine . . . in its development of the RTI Product."  (D. Ex. A).  RTI argues that "[t]he marketing brochure literally has nothing to do with the programming code for the RTI product." (Prelim. Inj. Resp. 10).  However, we do not find it plausible that RTI would distribute sales brochures that aim at attracting potential customers for a feature of the product that does not exist.

RTI argues that it could not misappropriate QSRSoft's trade secrets because RTI did not acquire the trade secrets through "improper means."  (Prelim. Inj. Resp. 1).  The ITSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other

means." 765 ILCS 1065/2(a). Evidence shows that RTI acquired access to the DotComm System password protected website by inducing FAF, through Matejka, to breach its confidential relationship with QSRSoft, as contained in the Agreement. According to Matejka, although he did not read the Agreement, he understood the Agreement to prohibit FAF from distributing the password to anyone outside the FAF organization. (R. 44). FAF was bound by the Agreement once Matejka accessed the password protected website with the understanding that the password was not to be distributed to others outside of FAF. *See Wood v. Wabash County*, 722 N.E.2d 1176, 1179 (Ill. App. Ct. 1999)(stating that an implied-in-fact contract is one in which an agreement may be inferred by performance of the parties). Thus, a confidential relationship existed between QSRSoft and FAF, and the evidence shows that RTI induced FAF to breach the confidential relationship.

RTI also contends that "[t]here is absolutely no evidence that RTI knew that FAF was not authorized" to send RTI access information for the DotComm System. (Prelim. Inj. Resp. 11). However, this argument belies that RTI received the information from a FAF representative, rather than going directly to QSRSoft. In an email from Sten to Matejka, Sten requested specific information regarding the DotComm System, including sample reports, cost, internet speed, and timing. RTI could only acquire this information through a password protected website, which RTI could not access unless it signed a licensing agreement or received the information from FAF. Additionally, as stated above, RTI employees downloaded and saved the DotComm data archive containing historical FAF data that establishes

21

the Specific ISP Data. RTI cannot claim that it did not know or understand that FAF was not authorized to send RTI access information for the password protected website of a potential competitor.

Finally, RTI argues that "the very terms of [QSRSoft's] own License Agreement allow FAF to do exactly what it did in this case—disclose DotComm Products to a third-party (such as RTI)." We disagree. The Agreement states that:

> . . . Licensee may *not* use the DotComm Product in a production environment, to produce revenue for Licensee, to demonstrate or provide Dotcomm Product to any other party or to develop software owned by any party other than QSRSoft.

(P. Ex. 3)(emphasis added). Although the licensing agreement may contemplate a breach of the Agreement, such a contemplation cannot be interpreted to mean that FAF could disclose the DotComm System to RTI. Therefore, the similarities between the DotComm System, combined with the unfettered access by RTI's employees to the DotComm System, as well as QSRSoft's alleged investment of "over two and a half years [and] more than $2,000,000 . . . ," (Mot. 13), and RTI's relative lack of knowledge in this type of reporting system, as evidenced by RTI's need to access the DotComm System password protected website, give strong support to QSRSoft's claims of trade secret misappropriation and use of the trade secrets for business purposes by RTI.

## II. Inadequate Remedy at Law & Irreparable Harm

There is a rebuttable presumption of irreparable harm to a plaintiff in cases of

trade secret misappropriation and copyright infringement. *Atari Inc.*, 672 F.2d at 620; *ISC-Bunker Ramo Corp*, 765 F.Supp. at 1329. A defendant can rebut this presumption by demonstrating that the plaintiff will not suffer any harm if the injunction is not granted. *See Wainwright Secs., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977)(explaining the rebuttable presumption). QSRSoft alleges that it has expended "over two and a half years, more than $2,000,000, and employed three full-time software developers and system architects" to develop the DotComm System. (Mot. 13). QSRSoft claims that up until the point when QSRSoft introduced the DotComm System, there had not been a product on the market that similarly isolated and compiled the amount and type of data like the DotComm System. While RTI also has access to the ISP data and advertises to franchisees, RTI's expertise lies in accounting software which uses limited amounts of the ISP data. Even if QSRSoft were to succeed on its claims of copyright infringement and trade secret misappropriation, assessing the monetary value of QSRSoft's head start in the market would be nearly impossible. If RTI is allowed to market Reports+ to consumers, QSRSoft's head start will be lost and QSRSoft will be unable to reap the benefits as the initial market entrant, which would make assessing damages difficult. *See Ty*, 237 F.3d at 903 (stating that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill"); *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 (7th Cir. 1980)(noting that damage to servicing clients efficiently constitutes irreparable harm). Additionally, RTI has failed to demonstrate

23

that QSRSoft will not suffer any harm if the injunction is not granted and failed to note any harm that would come to RTI if the injunction is granted. Instead, RTI simply states that QSRSoft "offered absolutely no evidence of its alleged irreparable harm at the Evidentiary Hearing." (Prelim. Inj. Resp. 15). Thus, we find that the balance of harms is clearly in favor of QSRSoft. Evidence establishes that QSRSoft is likely to prove material infringement in its copyright and trade secret misappropriation claims and the harm to RTI's potential sales of Reports+ is offset by the irreparable harm it may cause QSRSoft's business, reputation, and customer goodwill. QSRSoft also has shown no adequate remedy at law exists.

## IV. Public Interest

We find that granting an injunction is also in the public interest. The public is generally interested in upholding intellectual property rights, encouraging innovation and creativity, and rewarding those that take the risk and invest resources in pursuit of such innovation and creativity. *See generally*, United States Constitution, Art. I, sec. 8, cl. 8. Additionally, the public is unlikely to suffer any harm if RTI refrains from accessing, downloading, or copying the DotComm System. The public will also not suffer any harm if RTI is not allowed to destroy any materials that may be necessary to the instant matter, or if RTI is required to return the material that RTI acquired while accessing the DotComm System. Finally, since RTI has indicated that it "has no plan to offer the RTI Reports+ product during the pendency of this litigation" the public is unlikely to be harmed since Reports+ would not be on the

market for sale.  (D. Ex. B).

## CONCLUSION

Based on the foregoing analysis, we grant QSRSoft's motion for a preliminary injunction.


Samuel Der-Yeghiayan
United States District Court Judge


Dated:   October 19, 2006