# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

QSRSOFT, INC.                    )
                                 )
                Plaintiff,       )
                                 )
        v.                       )        No.  06 C 2734
                                 )
RESTAURANT TECHNOLOGY, INC.,     )
et al.,                          )
                                 )
                Defendants.      )


## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendants James H. Clutter's ("Clutter"),

and J. Neal Starkey's ("Starkey") (collectively referred to as "Individual

Defendants") motion to dismiss Counts II through VII.  For the reasons stated below,

we deny Individual Defendants' motion to dismiss to the extent that it relates to

Counts II, III, IV, VI, and VII, and grant the motion to dismiss to the extent that it

relates to Count V.


## BACKGROUND

QSRSoft contends that every McDonald's Restaurant has a McDonald's

Corporation computer system, an in store processor ("ISP"), that stores data about

the restaurant's sales performance and status. McDonald's Corporation allegedly provides restaurant operators with limited reports, called R2D2, but in no relation to Star Wars, generated from the ISP data. Additionally, QSRSoft alleges that McDonald's Corporation has approved QSRSoft and Restaurant Technology, Inc. ("RTI") as back-office vendors, meaning that each has access to the data stored in the ISP. Both QSRSoft and RTI provide software tools to McDonald's Restaurant franchise owners and operators ("franchisees"). QSRSoft contends that both companies' software tools use data extracted from the ISP.

QSRSoft alleges that it developed the DotComm System, an internet-based computer system that assists franchisees in analyzing information collected from the restaurants. QSRSoft contends that the DotComm System differs from other competitors' systems in that it more quickly collects and processes information from restaurants, provides automatic information transfer backup, and provides underlying detail or reports. QSRSoft alleges that if a franchise wants to use the DotComm System, the franchisee must first obtain a licensing agreement, which includes a provision that only key management personnel are permitted to access the DotComm System due to its proprietary nature. According to QSRSoft, a franchisee is provided with the opportunity to evaluate the DotComm System for thirty days under the terms of a software evaluation licensing agreement. QSRSoft contends that once the franchisee agrees to the licensing agreement and identifies a list of the key personnel that will have access to the DotComm System, QSRSoft sends the franchisee an access code and unique password. QSRSoft alleges that the DotComm System

automatically instructs the user to change the password when the franchisee accesses the system for the first time. According to QSRSoft, the franchisee informs QSRSoft of the updated password.

QSRSoft contends that Clutter is the President of RTI, as well as a shareholder, director, and employee of RTI, and that Starkey is a shareholder, officer, and director of RTI. QSRSoft further claims that in January 2006, RTI, who provides predominantly accounting software to fast food restaurants, contacted F.A.F., Inc. d/b/a McDonald's Restaurant ("FAF"), which operates nine McDonald's restaurants in Fargo, North Dakota, to obtain information from QSRSoft about the DotComm System. QSRSoft contends that in February 2006, Gregg Matejka ("Matejka"), FAF's director of operations, contacted QSRSoft about evaluating the DotComm System in one of FAF's McDonald's restaurants. QSRSoft claims that it subsequently sent a licensing agreement ("Agreement") to FAF and requested that the Agreement be executed and returned to QSRSoft. QSRSoft further alleges that on February 8, 2006, QSRSoft sent an access code and password to FAF in anticipation of receiving the executed Agreement from FAF. Although FAF did not return the Agreement, QSRSoft contends that FAF understood that FAF was accepting the terms of the Agreement and would use the DotComm System subject to such terms. QSRSoft claims that on February 8, 2006, FAF accessed the DotComm System using the newly provided access code and password, a process that required FAF to change the initial password. According to QSRSoft, on or about February 9, 2006, FAF provided the Defendants with the access code and the

recently changed password ("FAF password").

QSRSoft alleges that the Defendants used the FAF password from February 2006 until April 30, 2006 in order to gain access to the DotComm System, view, download, save, print, and copy each web page on the DotComm System, as well as to download the QSRSoft Data Engine, the backbone of the DotComm System's ability to extract restaurant information. QSRSoft claims that the Defendants were able to use the information it received from accessing the DotComm System to develop Reports+, a similar RTI product for McDonald's franchises.

On August 8, 2006, QSRSoft filed an amended complaint that includes claims alleging copyright infringement under the Copyright Act of 1976, 17 U.S.C. 101 *et seq.* ("Copyright Act") brought against RTI (Count I), James H. Clutter ("Clutter") (Count II), and J. Neal Starkey ("Starkey") (Count III), claims alleging violations of the Illinois Trade Secret Act, 765 ILCS 1065/1 *et seq.*, ("ITSA") brought against RTI, Clutter, and Starkey (Count IV), conversion claims brought against RTI, Clutter, and Starkey (Count V), tortious interference with prospective business advantage claims brought against RTI, Clutter, and Starkey (Count VI), and tortious interference with contract claims brought against RTI, Clutter, and Starkey (Count VII).

On August 23, 2006, RTI filed a partial motion to dismiss Counts IV, V, and VII. On October 18, 2006 we denied RTI's partial motion to dismiss to the extent that it related to Counts IV and VII, and granted the motion to dismiss to the extent that it related to Count V.

A preliminary injunction hearing was held on September 19, 2006, and this court directed QSRSoft and RTI to file briefs in support of their positions. On October 19, 2006, we granted QSRSoft's motion for a preliminary injunction. The Individual Defendants now move for dismissal of the instant action.

## LEGAL STANDARD

In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002); *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991). The allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Baker v. Kingsley*, 387 F.3d 649, 664 (7th Cir. 2004)(stating that although the "plaintiffs' allegations provide[d] little detail [the court could not] say at [that] early stage in the litigation that plaintiffs [could] prove no set of facts in support of their claim that would entitle them to relief"). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.*, 144 F.3d 448, 454-55 (7th Cir. 1998). Under the current notice pleading standard in federal courts, a plaintiff need not "plead facts

that, if true, establish each element of a 'cause of action . . . .'" *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)(stating that "[a]t this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint" and that "[m]atching facts against legal elements comes later"). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002); *Kyle*, 144 F.3d at 455. However, any conclusions pled must "provide the defendant with at least minimum notice of claim," *id.*, and the plaintiff cannot satisfy federal the pleading requirement merely "by attaching bare legal conclusions to narrated facts which fail to outline bases of [his] claims." *Perkins*, 939 F.2d at 466-67. The Seventh Circuit has explained that "[o]ne pleads a 'claim for relief' by briefly describing the events." *Sanjuan*, 40 F.3d at 251.

## DISCUSSION

I. Sufficiency of Pleadings Generally

The Individual Defendants argue that Counts II through VII must be dismissed because QSRSoft failed to allege "any facts relating to the Individual Defendants." (Mot. 4). As previously noted, under federal notice pleading rules, "the [Federal] Rules [of Civil Procedure] require . . . a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics and Intelligence Coordination Unit*, 507 U.S. 163, 168 (1993); *accord Scott v. City of Chicago,* 195

F.3d 950, 951 (7th Cir.1999). In order to give fair notice, "a complaint must at least 'include the operative facts upon which a plaintiff bases his claim.'" *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir.1992)(quoting *Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 198 (7th Cir.1985)). A plaintiff "need not plead facts; he can plead conclusions." *Jackson v. Marion County*, 66 F.3d 151, 153-54 (7th Cir.1995). However, those "conclusions must provide the defendant with at least minimal notice of the claim." *Id*. The Individual Defendants contend that dismissal of Counts II through VII is warranted because QSRSoft has "entirely omitted any facts that relate to the Individual Defendants, [individually by name]," and instead refers to the Individual Defendants and RTI collectively as "Defendants" throughout the Amended Complaint. The Individual Defendants argue that QSRSoft thereby fails "to provide the Individual Defendants with the fair and required notice of the grounds upon which [QSRSoft's] claims are based." (Mot. 4). QSRSoft argues that the factual allegations set forth in the Amended Complaint "put the Individual Defendants on notice of [QSRSoft's] claims against [the Individual Defendants]" because the Individual Defendants are incorporated by reference in the section entitled "Factual Allegations Common to All Claims" as "Defendants." (Resp. 3).

Although QSRSoft does not specify which Defendant, RTI or the Individual Defendants, committed each alleged act, QSRSoft's allegations are more than adequate to state claims against the Individual Defendants. In Counts II and III, the Individual Defendants are identified by name as Clutter and Starkey, respectively. (A. Compl. 12-14). Additionally, QSRSoft collectively asserts all of its claims

against "Defendants" throughout the Amended Complaint, and does not deviate from this practice throughout the factual allegations set forth in the Amended Complaint. Simply because QSRSoft chose not to specifically name the Individual Defendants throughout the Amended Complaint does not impact the significance of QSRSoft's legal claims. QSRSoft has adequately identified each Defendant (RTI, Clutter, and Starkey), the factual allegations related to all Defendants, and the claims pertinent to each Defendant to give notice of the claims against the Individual Defendants. Further questions as to the specific legal theories and specific claims brought against the Individual Defendants is properly left to the discovery stage. Therefore, we find that QSRSoft's Amended Complaint simply and directly narrates Counts II through VII, which informs the Individual Defendants of the claims and bases of the claims contained in the Amended Complaint, and we deny the Individual Defendants' motion to dismiss Counts II through VII due to the insufficient pleadings.

## II.  Copyright Infringement Claims (Counts II and III)

The Individual Defendants also argue that QSRSoft "does not state any facts, but merely quotes the elements of a claim for contributory and vicarious copyright infringement. . . ." (Mot. 5). In order to state a claim for contributory and vicarious copyright infringement, the plaintiff must plead sufficient facts for a valid claim of direct copyright infringement. *In re Aimster Copyright Litig.*, 334 F.3d 643, 654-55 (7th Cir. 2003); *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)(stating that "[s]econdary liability for copyright infringement does

not exist in the absence of direct infringement by a third party").  A direct copyright infringement claim is sufficiently pled when the plaintiff alleges that:  (1) the plaintiff owned a valid copyright; and (2) the defendant copied original elements, or infringement, of the work.  *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).  In order to state a claim for contributory copyright infringement, the plaintiff must allege that the defendant: (1) had knowledge of the direct infringer's conduct; and (2) materially contributed to the infringing conduct.  *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877, 883 (N.D. Ill. 2005); *see In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 654 (N.D. Ill. 2002)(stating that a contributory copyright infringement occurs when the defendant "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another").  Additionally, to state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant:  (1) at all material times possessed the right and ability to supervise the infringing activity; and (2) has a direct financial interest in the infringer's activity.  *Aimster*, 252 F. Supp. 2d at 654.

The Individual Defendants contend that QSRSoft has pled no facts in support of QSRSoft's claims of contributory and vicarious copyright infringement against the Individual Defendants.  QSRSoft counters by arguing that "the Amended Complaint is saturated with applicable facts and inferences supporting allegations of vicarious and contributory infringing activity, which . . . have been incorporated into Counts II and III."  (Resp. 4).  We agree with QSRSoft.  The fact that QSRSoft chose not to specifically name the Individual Defendants throughout the Amended Complaint

does not impact the significance of QSRSoft's legal claims.  QSRSoft has

incorporated the Individual Defendants into the Amended Complaint, which is

sufficient to plead the operative facts and place the Individual Defendants on notice

of QSRSoft's claims against the Individual Defendants.

QSRSoft has also sufficiently pled claims against the Individual Defendants

for contributory and vicarious copyright liability.  QSRSoft includes a claim of direct

copyright liability in Count I of the Amended Complaint, where it has pled that

QSRSoft has "secured registration for the exclusive rights and privileges in and to

the copyright[ed]" works, (A. Comp. 9), that QSRSoft is the owner of the copyrights,

and that RTI directly infringed QSRSoft's copyrighted works "by [RTI's]

unauthorized use of [QSRSoft's] copyrighted materials in violation of QSRSoft's

exclusive rights as the copyright owner, and by [RTI's] unauthorized creation of RTI

Reports+. . . ." (A. Comp. 10).  Additionally, Counts II and III allege:

> 48. [and 52.]  To the extent applicable, Plaintiff realleges Paragraphs 1
> through 47 of this Complaint and makes the same a part of [these Counts] as if
> fully set forth.
> 49. [and 53.]  Clutter [and Starkey], at all material times, possessed the right
> and ability to supervise the infringing activities of RTI.
> 50. [and 54.]  Clutter [and Starkey] [had] and at all material times [have] a
> direct financial interest in RTI's infringing activities.
> 51. [and 55.]  Clutter [and Starkey] had knowledge of RTI's infringing
> conduct and actively induced, caused and materially contributed to the
> infringing conduct of RTI.

Although the allegations set forth in Counts II and III do not list every fact of

contributory and vicarious copyright liability, such detail is not necessary under the

federal notice pleading requirement.  *See Int'l Marketing, Ltd. v. Archer-Daniels-Midland, Co.*, 192 F.3d 724, 733 (7th Cir. 1999)(stating that the "only function pleadings must serve is to give notice of the claim; the development of legal theories and correlation of facts to theory come later in the process"); *see also E.E.O.C. v. Park Ridge Public Library*, 856 F. Supp. 477, 479 (N.D. Ill. 1994)(noting that "mere vagueness or lack of detail is not sufficient to justify a dismissal").  Drawing all reasonable inferences that favor QSRSoft, construing the allegations of the complaint in the light most favorable to QSRSoft, and accepting as true all well-pleaded facts and allegations in the complaint, the court finds that the allegations set forth in Counts II and III "provide the [Individual Defendants] with at least a minimal notice of the claim."  *Jackson*, 66 F.3d at 153-54 (stating that a plaintiff "need not plead facts; he can plead conclusions" if "the conclusions . . . provide the defendant with at least minimal notice of the claim").  Therefore, we deny the Individual Defendants' motion to dismiss to the extent that it relates to Counts II and III.

III.  Illinois Trade Secret Act Claim (Count IV)

Under the ITSA, trade secret misappropriation occurs when:  (1) there is a trade secret; (2) the trade secret is misappropriated by the defendant; and (3) the defendant used the trade secret for business purposes.  *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992)(citing 765 ILCS 1065/2).  The ITSA defines a trade secret as:

[I]nformation, including but not limited to, technical or non-technical data, a

formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). The ITSA therefore "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large," *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct. 1998), and "requires a plaintiff to take 'affirmative measures' to prevent others from using information." *Jackson v. Hammer*, 653 N.E.2d 809, 816 (Ill. App. Ct. 1995); *see Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003)(noting that the ITSA "prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection").

A. Existence of Trade Secrets

Just as RTI argued in its partial motion to dismiss, the Individual Defendants contend that QSRSoft's ITSA claim in Count IV must be dismissed since QSRSoft disclosed its trade secret to a third-party. The Individual Defendants argue that since QSRSoft allowed FAF to access the DotComm System without a valid licensing agreement, QSRSoft's intellectual property has fallen into the public domain and is

no longer considered a trade secret. However, as stated in our Memorandum Opinion, dated October 18, 2006, QSRSoft has sufficiently pled numerous affirmative measures that prevent outsiders from learning the inner workings of the DotComm System. First, QSRSoft alleges that its trade secrets are located on a password protected website, which is not accessible to the public or QSRSoft's competitors. Second, QSRSoft alleges that it does not allow public access to the DotComm System and contends that customers are required to abide by licensing agreements before QSRSoft provides the required access codes and passwords to access the DotComm System. Third, QSRSoft alleges that it uses licensing agreements to restrict access to the DotComm System to "key management people who work for the [franchisee]." (A. Compl. Par. 9). QSRSoft further requires the franchisee to inform QSRSoft of the specific restaurant and specific persons authorized by the franchisee to access the DotComm System. Fourth, QSRSoft has never released the DotComm System to the public at large. Fifth, QSRSoft maintains control of DotComm System access by requiring the licensee to inform QSRSoft of the updated password once the franchisee accesses the DotComm System. Finally, as discussed below, QSRSoft has pled sufficient facts to intimate that it is reasonably possible that a valid agreement exists between QSRSoft and FAF, thus limiting the exposure to key FAF personnel rather than to the public at large.

To support their contention, the Individual Defendants note that in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984), "the United States

13

Supreme Court has stated *expressly* that trade secrets are extinguished" when provided to a third-party that is not obligated to protect the confidentiality of the trade secrets. (Mot. 9)(emphasis in motion). The Individual Defendants contend that the Supreme Court has stated:

> Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. Information that is public knowledge or that is generally known in an industry cannot be a trade secret. *If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.*

(Mot. 9)(citing *Ruckelshaus*, 467 U.S. at 1002)(emphasis in motion). If the Supreme Court had been speaking directly of a single third-party disclosure of a trade secret, this quotation would be persuasive. However, as noted in this court's Memorandum Opinion, dated October 18, 2006, in *Ruckelshaus*, the Supreme Court was faced with the question of whether the Takings Clause of the Fifth Amendment applied to the Environmental Protection Agency's ("EPA") public disclosure of a trade secret, an intangible property, in the same way it would to tangible property. 467 U.S. at 1001-02. The particular phrase cited by the Individual Defendants was used by the Supreme Court to compare trade secrets to tangible property in finding that the plaintiff, Monsanto, had a property right that is protected by the Takings Clause since trade secrets have many of the characteristics of tangible property. *Id.* at 1001-04. Thus, the statement referred to by the Individual Defendants is merely a general statement of the law rather than support that QSRSoft waived its trade secrets.

Additionally, the Individual Defendants direct the court to *Skoog v. McCray Refrigerator Co.*, 211 F.2d 254, 257 (7th Cir. 1954) and argue that QSRSoft's degree of disclosure extinguished QSRSoft's trade secret. In citing *Skoog*, the Individual Defendants note that "[t]he Seventh Circuit has held that the disclosure of a trade secret to those under no obligation to protect its confidentiality destroys the trade secret." (Mot. 10). However, in *Skoog*, the court found that the defendant could not misappropriate the trade secret at issue, a refrigerated cabinet, because the trade secret was no longer hidden from the public. 211 F.2d at 257-58. Specifically, the trade secret was extinguished because the plaintiff's refrigerated cabinet had been in unrestricted use in the plaintiff's grocery store, was visible to anyone that entered the store, and the defendant had expressly stated that it did not accept the plaintiff's non-disclosure agreement. *Id.* Based on the pleadings, we find that QSRSoft has sufficiently pled that its trade secrets have been hidden from the general public and competitors through use of licensing agreements and a password protected website. *See Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995)(finding that trade secret had not been waived when reasonable efforts were taken to protect secrecy of trade secrets from competitors); *cf. Skoog*, 211 F.2d at 257 (stating that it is "well established that there can be no confidential disclosure where there has been a prior disclosure to the *public without reservation*")(emphasis added). Therefore, the instant action is distinguishable from *Skoog*.

Just as RTI argued in its partial motion to dismiss, the Individual Defendants argue that *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp.

316, (N.D. Ill. 1995), supports the proposition that QSRSoft did not make reasonable efforts to protect its trade secret. (Mot. 8)(stating that "*this [c]ourt has found that under the [ITSA], the failure of [sic] party to protect the confidentiality of its trade secret will subject that claim to dismissal as a matter of law*")(emphasis in motion). In *Web Communications*, the court held that the plaintiff's trade secret misappropriation claim failed "because [plaintiff] took virtually no steps to protect the confidentiality" of the trade secret, a stepped advertising insert. 889 F. Supp. at 320. In finding that virtually no reasonable efforts had been taken, the court noted that none of the documents relating to the trade secret were marked as confidential (as was the plaintiff's policy with trade secrets), there was not a confidentiality agreement with the defendant, the plaintiff disclosed "either dummies or specifications" for the trade secret at issue to suppliers and competitors, and the plaintiff's president acknowledged that the competitor would be able to use the disclosed information for its own benefit. *Id.* The Individual Defendants argue that QSRSoft's efforts to protect its trade secrets are identical to that of the plaintiff in *Web Communications*. However, unlike the plaintiff in *Web Communications* that "took virtually no steps to insure the confidentiality of the stepped insert," *id.* at 320, QSRSoft has pled a number of reasonable efforts to protect its trade secrets, including the use of licensing agreements and a password protected website. Therefore, QSRSoft has sufficiently pled the existence of a trade secret, and the trade secret has not been waived.

B.  Sufficiency of Pleadings for ITSA Claim

Individual Defendants move to dismiss QSRSoft's claim for trade secret misappropriation on the basis that QSRSoft, again, failed to set forth operative facts in the Amended Complaint.  The Individual Defendants argue that QSRSoft's complaint alleges "unsupported legal conclusions against an unspecified set of 'Defendants,'" rather than facts specific to the Individual Defendants.  (Mot. 2). QSRSoft contends that the factual allegations set forth in the Amended Complaint "put the Individual Defendants on notice of [QSRSoft's trade secret misappropriation] claims against [the Individual Defendants]" because the Individual Defendants are incorporated by reference in the section entitled "Factual Allegations Common to All Claims" as "Defendants."  (Resp. 3).  As already noted, QSRSoft's use of "Defendants," rather than the Individual Defendants by name, is sufficient to give Individual Defendants notice of QSRSoft's claim of tortious interference with prospective business advantage and the ground upon which the claim rests. Additionally, QSRSoft has sufficiently pled:   (1) the existence of valid trade secrets; (2) that the Individual Defendants misappropriated those trade secrets by improperly accessing and downloading QSRSoft's trade secrets by improperly accessing the DotComm System; and (3) that the Individual Defendants used QSRSoft's trade secrets for the purpose of developing Reports+.   QSRSoft has sufficiently pled a claim for trade secret misappropriation against the Individual Defendants.

Therefore, because QSRSoft has sufficiently pled the existence of a claim for trade secret misappropriation against the Individual Defendants, sufficiently pled the

17

existence of a trade secret, and the trade secret has not been waived, we deny the Individual Defendants' motion to dismiss to the extent that it relates to Count IV.

Additionally, we remind the Individual Defendants that in ruling on a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of the pleadings rather than decides the merits of the claims. As the court has stated, we draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *McMillan v. Collection Prof'ls, Inc.*, 455 F.3d 754, 758 (7th Cir. 2006). In evaluating the sufficiency of the pleadings, the court cannot make factual inquiries. Arguments based on the merits of the case that ask this court to make factual inquiries into the sufficiency of the evidence are more appropriate at the summary judgment stage.

IV.  Conversion Claim (Count V)

Individual Defendants argue that QSRSoft's conversion claim in Count V is preempted by the ITSA and moves to dismiss Count V. Section 8(a) of the ITSA reads: "[T]his Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). The ITSA abolishes all common law causes of action based upon a theory of trade secret misappropriation, except for breach of contract actions. *See Composite Marine Propellers, Inc.*, 962 F.2d at 1265 (stating that "Illinois has abolished all common law theories of misuse"

of trade secret information and that "[u]nless defendants misappropriated a (statutory) trade secret, they did no legal wrong"). Thus, if a cause of action can otherwise be brought under the ITSA, that cause of action is preempted. *AutoMed Techs., Inc. v. Eller*, 160 F.Supp.2d 915, 922 (N.D. Ill. 2001).

QSRSoft fails to address the Individual Defendants' motion to dismiss Count V. On October 18, 2006, we granted RTI's partial motion to dismiss to the extent that it related to Count V based upon the same argument made by the Individual Defendants. (Mem. Op. Oct. 18, 2006.) For similar reasons stated in our Memorandum Opinion dated October 18, 2006, we agree with the Individual Defendants. QSRSoft alleges that the Individual Defendants converted QSRSoft's "Proprietary Materials" located in the DotComm System, including:

> a) the source code;
> b) the Data Engine;
> c) the 100+ web-page displays . . . ;
> d) the Specific ISP Data; and
> e) the type and method of polling the DotComm System utilizes.

(A. Compl. Par. 67). These "Proprietary Materials" are identical to the trade secrets that QSRSoft alleges that the Individual Defendants misappropriated in Count IV, which reads:

> The following items located in Plaintiff's password protected DotComm System are confidential and proprietary, and constitute Plaintiff's trade secrets (collectively, "Trade Secrets"):
> > a) the source code;
> > b) the Data Engine;
> > c) the 100+ web-page displays . . .;
> > d) the Specific ISP Data; and

e) the type and method of polling the DotComm System utilizes.

(A. Compl. Par. 57).  As stated in our Memorandum Opinion on October 18, 2006, by pleading in the alternative, QSRSoft's claim for conversion of its "Proprietary Materials" is simply another way of claiming that the Individual Defendants misappropriated QSRSoft's intellectual property, for which the ITSA is the sole remedy.  Thus, QSRSoft's claim for conversion is preempted by the ITSA and we grant the Individual Defendants' motion to dismiss Count V.

## V.  Tortious Interference with Prospective Business Advantage (Count VI)

### A.  Sufficiency of Pleadings for Tortious Interference with Prospective Business Advantage Claim

The Individual Defendants move to dismiss QSRSoft's claim for tortious interference with prospective business advantage because QSRSoft failed to set forth operative facts to support the claim.  Under Illinois law, the elements for a *prima facie* case for tortious interference with prospective business advantage claim are that: (1) the plaintiff had a reasonable expectancy of entering into a valid business relationship; (2) the defendant knew of the prospective business relationship; (3) the defendant intentionally interfered with the prospective business relationship; (4) the prospective business advantage did not come to fruition due to the defendant's intentional interference; and (5) the interference caused damage to the plaintiff.

*Interim Health Care of Northern Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 886 (7th Cir. 2000).

The Individual Defendants argue that QSRSoft's complaint contains "unsupported legal conclusions against an unspecified set of 'Defendants,'" rather than facts specific to the Individual Defendants. (Mot. 2). QSRSoft contends that the factual allegations set forth in the Amended Complaint "put the Individual Defendants on notice of [QSRSoft's tortious interference with prospective business advantage] claims against [the Individual Defendants]" because the Individual Defendants are incorporated by reference in the section entitled "Factual Allegations Common to All Claims" as "Defendants." (Resp. 3). As noted above, QSRSoft's use of the word "Defendants," rather than pointing to the Individual Defendants by name, is sufficient to give Individual Defendants notice of QSRSoft's claim of tortious interference with prospective business advantage and the ground upon which the claim rests. Additionally, QSRSoft has sufficiently pled that QSRSoft had a reasonable expectation of entering into business relationships with franchisees, that the Individual Defendants had knowledge that QSRSoft used the DotComm System to attract franchisees as customers, that the Individual Defendants intentionally interfered with QSRSoft's business expectancy with franchisees by advertising, demonstrating, offering to license, and licensing Reports+ to franchisees, that the franchisees did not purchase the DotComm System due to the Individual Defendants' sale of Reports+, and that such activity by the Individual Defendants damaged QSRSoft. Thus, QSRSoft has sufficiently pled facts to put the Individual Defendants

21

on notice of the claim and to survive the Individual Defendants' motion to dismiss.

### B.  Corporate Privilege

The Individual Defendants also argue that QSRSoft's claim for intentional interference with prospective business advantage against the Individual Defendants must fail because both of the Individual Defendants are clothed in a privilege under Illinois law.  Under Illinois law,  "[c]orporate officers, directors, shareholders and agents are normally privileged against claims that their activities interfered in a third party's relationships with [the officers] principals." *Citylink Group v. Hyatt Corp.*, 729 N.E.2d 869, 877 (Ill. App. Ct. 2000); *see also Swager v. Couri*, 395 N.E.2d 921 (Ill. 1979).  Where this privilege is applicable, a plaintiff can overcome it by showing that the defendant acted with malice.  *3Com Corp. v. Elec. Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 938 (2000).  The privilege is only applicable to protect corporate officers and directors from actions taken during the scope of their employment that cause interference between a third-party and their employer or principal.  *See Siakpere v. Boucher*, 1986 WL 5657, at *2 (N.D. Ill. 1986)(holding qualified privilege for corporate officers is designed to defend against claims against individual corporate officers for interfering with their corporation's own contracts); *see also Langer v. Becker*, 531 N.E.2d 830 (Ill. App. Ct. 1988)(noting that the privilege extends to both the corporation's contracts and third-party's contracts that affect the corporation).  The policy question in determining whether a corporate officer's actions are covered by privilege under Illinois law is "whether protection of

the particular contractual interest at issue merits prohibition of the particular conduct at issue." *Swager*, 395 N.E.2d at 928.

This privilege is inapplicable in the instant case. The Individual Defendants have a relationship with RTI that is similar to the relationship between a corporate officer and a corporation. The particular "contractual interest at issue" is the prospective business advantage QSRSoft expected by being the first vendor to offer a software tool with the capabilities and advantages of the DotComm System to McDonald's franchisees. QSRSoft's expectancy of valid business relationships with McDonald's franchisees is a result of the time and resources QSRSoft has invested in producing the DotComm System. The "particular conduct at issue" is the Individual Defendants' alleged use of information they gathered from the DotComm System to produce a similar software tool, Reports+, and compete with QSRSoft for the McDonald's franchisees' business without investing the same time and resources spent by QSRSoft. Protecting QSRSoft's business advantage prohibits the Individual Defendants' alleged conduct. If licensing agreements with RTI had been the subject of QSRSoft's prospective business advantage instead of licensing agreements with McDonald's franchisees, then the Individual Defendants, through their relationship to RTI, might be privileged in their decision to interfere if their actions were done to benefit RTI. This is not the case in the instant matter. Here, the Individual Defendants, on behalf of RTI, allegedly interfered with the prospective business advantage QSRSoft expected with third parties, i.e., McDonald's franchisees. The purpose and policy of the corporate officer privilege is not served

here.  Accordingly, QSRSoft was under no obligation to plead malice with particularity against the Individual Defendants and has otherwise sufficiently pled the elements of intentional interference with prospective economic advantage. Therefore, the Individual Defendants' motion to dismiss with respect to Count VI is denied.

## VI.  Tortious Interference with Contract Claim (Count VII)

Under Illinois law, elements for a *prima facie* case for tortious interference with contract claim are:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages.

*Voelker v. Porsche Cars North Am., Inc.*, 353 F.3d 516, 527-28 (7th Cir. 2003)(citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

### A.  Existence of Contract

The Individual Defendants move to dismiss QSRSoft's claims for tortious interference with contract on the basis that QSRSoft did not have a valid enforceable licensing agreement with FAF.  The Individual Defendants argue that because the Agreement sent to FAF was not signed by representatives from either QSRSoft or

FAF, was not dated by the parties, and did not reference FAF, that there was never a formally executed contract with which the Individual Defendants could interfere. QSRSoft responds that its allegation that FAF understood that it would be bound by the Agreement was sufficient to establish the existence of an oral contract. For similar reasons stated in our Memorandum Opinion, dated October 18, 2006, the court finds the arguments by both parties unpersuasive.

QSRSoft alleges that on February 8, 2006, FAF requested that QSRSoft implement the DotComm System in FAF's Fargo, North Dakota McDonald's restaurant ("Fargo Restaurant") in order to evaluate the software. QSRSoft also contends that thereafter, QSRSoft sent FAF the Agreement, which contained confidentiality, non-disclosure, copyright, and licensing statements. QSRSoft also contends that it requested that FAF execute and return the agreement in return for an access code and password, which would allow FAF operations personnel at the Fargo Restaurant to access the DotComm System. Additionally, QSRSoft alleges that on February 8, 2006, QSRSoft sent an access code and password to FAF. QSRSoft further alleges that on that day, FAF personnel accessed the password protected website using the access code and password delivered by QSRSoft. The following day, FAF allegedly informed QSRSoft of the updated access code and the recently changed password. According to QSRSoft, however, FAF did not return the Agreement.

The pleadings do not indicate the existence of either an express written contract or an express oral contract, as QSRSoft suggests, between QSRSoft and

FAF.  However, the court finds that the pleadings do contain facts from which we can reasonably infer the existence of an implied-in-fact contract.  An implied-in-fact contract is one in which an agreement may be inferred by performance of the parties. *Wood v. Wabash County*, 722 N.E.2d 1176, 1179 (Ill. App. Ct. 1999).  Furthermore, an implied-in-fact contract must contain all the elements of an express contract. *Razdan v. General Motors Corp.*, 2000 WL 1205990, at *2 (7th Cir. 2002)(Table of Decisions Without Reported Opinions)(citing *Foiles v. North Greene Unit Dist. No. 3*, 633 N.E.2d 24, 27 (Ill. App. Ct. 1994)).  Thus, for an implied-in-fact contract to be valid, the contract "must contain offer, acceptance, and consideration."  *Halloran v. Dickerson*, 679 N.E.2d 774, 782 (Ill. App. Ct. 1997).

Drawing all reasonable inferences in favor of QSRSoft, the court finds sufficient facts in the amended complaint that indicate the existence of an implied-in-fact contract between QSRSoft and FAF.  Alleging that FAF understood "that they were accepting and would use the access code and password subject to the terms of the license agreement," (A. Compl. Par. 25), that FAF accessed the website and changed the password on February 8, 2006, and that FAF subsequently informed QSRSoft of the updated account and password information on February 9, 2006, QSRSoft provides sufficient facts to infer that an implied-in-fact contract existed between the parties and that FAF intended to be bound by the terms of the Agreement.

The Individual Defendants argue that the attached licensing agreement to the amended complaint establishes that QSRSoft's claim for tortious interference with

contract must fail because the attached agreement is not formally executed.  For the purpose of Rule 12(b)(6) motions, a "copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes" if the document is referred to in the complaint and is integral to the claims in the complaint.  Fed. R. Civ. P. 10(c); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657 (7th Cir. 2002)(citing *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)); *see Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1988)(stating that any exhibits attached to a complaint must be incorporated into the pleading).  The use of exhibits to determine the sufficiency of the evidence is "aimed at cases interpreting, for example, a contract."  *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *see also Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930 (7th Cir. 2005)(using attached document to construe assignment agreement).  The Individual Defendants contend that since the attached licensing agreement represents "a true and correct copy of the contract" sent to FAF, and the attached contract is not signed by the parties to be bound, does not contain a date, and does not reference FAF, QSRSoft admits that no valid contract between the parties exists (Mot. 8).  We disagree.

Although QSRSoft makes reference to the attached licensing agreement, the particular attachment is not pertinent to construing the material terms of a contract between QSRSoft and the Individual Defendants, nor is it integral to the claim for tortious interference with contract.  Additionally, this court is allowed to "independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material." *Rosenblum*, 299 F.3d at 661.

This court has previously stated in this opinion that QSRSoft has sufficiently pled the elements which may infer the existence of an implied-in-fact contract, the terms of which are contained in the attached licensing agreement. After reviewing the attachment in question, we are satisfied that the attached licensing agreement reasonably could be a representation of the Agreement that QSRSoft delivered to FAF, rather than the specific Agreement intended to show that an express contract existed.

### B. Sufficiency of Pleadings for Tortious Interference with Contract Claim

Individual Defendants also move to dismiss QSRSoft's claim for tortious interference with contract on the basis that QSRSoft failed to set forth operative facts in the Amended Complaint. Again, the Individual Defendants argue that QSRSoft's complaint alleges "unsupported legal conclusions against an unspecified set of 'Defendants,'" rather than facts specific to the Individual Defendants. (Mot. 2). QSRSoft contends that the factual allegations set forth in the Amended Complaint "put the Individual Defendants on notice of [QSRSoft's tortious interference with contract] claims against [the Individual Defendants]" because the Individual Defendants are incorporated by reference in the section entitled "Factual Allegations Common to All Claims" as "Defendants." (Resp. 3). As noted above, QSRSoft's use of the word "Defendants," rather than pointing to the Individual Defendants by name, is sufficient to give Individual Defendants notice of QSRSoft's claim of tortious interference with contract and the ground upon which the claim rests.

Additionally, as noted above, QSRSoft has sufficiently pled: (1) the existence of a valid implied-in-fact contract between QSRSoft and FAF; (2) that the Individual Defendants knew of the existence of a contract between QSRSoft and FAF; (3) that the Individual Defendants induced FAF to breach the contract; (4) that FAF breached the contract between FAF and QSRSoft; and (5) that QSRSoft was damaged by the Individual Defendants' conduct. *See HPI Health Care Servs., Inc.*, 545 N.E.2d at 676 (stating elements for *prima facie* case under Illinois law for tortious interference with contract). Thus, QSRSoft has sufficiently pled facts to put the Individual Defendants on notice of the claim and to sustain the Individual Defendants' motion to dismiss.

Therefore, at this stage in the litigation, we find that QSRSoft has made sufficient allegations to survive a motion to dismiss Count VII and, thus, we deny the Individual Defendants' motion to dismiss to the extent that it relates to QSRSoft's claim for tortious interference with contract. We again note that this court is not deciding the merits of QSRSoft's claim against the Individual Defendants for tortious interference with contract. As such, QSRSoft will need to point to sufficient evidence supporting its allegations, which are accepted as true at this stage in the litigation, in order to survive a motion, if any, at the summary judgment stage.

## CONCLUSION

Based on the foregoing analysis, we deny the Individual Defendants' motion to dismiss to the extent that it relates to Counts II, III, IV, VI, and VII, and grant the

motion to dismiss to the extent that it relates to Count V.



_Samuel Der-Yeghiayan_
Samuel Der-Yeghiayan
United States District Court Judge


Dated:   November 2, 2006